# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID BROWN** : | |
| : | |
| **Plaintiff,** : | |
| : | **CIVIL NO. 3:CV-03-2392** |
| **v.** : | |
| : | **(JUDGE VANASKIE)** |
| **BENJAMIN A. MARTINEZ, <u>ET AL.</u>,** : | |
| : | |
| **Defendants.** : | |
| : | |

# M E M O R A N D U M

## I.   Introduction.

David Brown, an inmate housed at the State Correctional Institution at Dallas, Pennsylvania ("SCI-Dallas"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against twenty-five (25) past and present employees of the Pennsylvania Board of Probation and Parole ("the Board") and the Pennsylvania Department of Corrections ("DOC").  On March 19, 2007, the Court granted, in part, Defendants' Motion for Summary Judgment and Amended Summary Judgment Motion.  (<u>See</u> Dkt. Entry 85.)  Two Eighth Amendment conditions of confinement claims related to Brown's stay in SCI-Camp Hill's Special Management Unit ("SMU") remain.[1]

---

[1]  The remaining defendants are:  Martin Dragovich, former Superintendent of SCI-Camp Hill; John Palakovich, former SCI-Camp Hill Deputy Superintendent for Centralized

Brown alleges that defendants agreed to conduct unauthorized psychological experiments on the SMU inmates by depriving them of adequate nutrition.  Plaintiff claims he was weighed every thirty days "to insure that he would fall below this normal body weight."  If his weight fell, defendants "would instruct the Food Service Department to increase the food portion."  As a result of these experiments Brown claims to have suffered physical and psychological harm.  (Dkt. Entry 1, Complaint at ¶¶ 32-33.)

Next, Brown alleges defendants subjected him to sleep deprivation experiments.  (Id. at ¶ 35.)  Specifically, he claims that he was exposed to constant illumination, cast by a security nightlight in his cell, which was located directly above his head.   (Id. at ¶ 34.)  Brown states that the high gloss, oil based, beige color paint of the SMU walls enhanced the brightness of the security light at night, impeding his ability to sleep.  Brown claims defendants sought to "intentionally interfere with plaintiff's sleeping ability."  He claims that as a result of the experimentation in sleep deprivation, he developed a "nerve problem, such as constant shaking of the head and hands, agitation, lack of concentration and easily irritated."   (Id. at ¶ 35.)

Following a telephonic scheduling conference held April 19, 2007, the Court granted defendants the opportunity to file a second motion for summary judgment addressing the merits of these remaining claims.  (Dkt. Entry 91).  Presently before the Court, fully briefed

---

Services; Blaine Steigerwalt, former Unit Manager of the Special Management Unit ("SMU") at SCI-Camp Hill; Robert Marsh, SCI-Camp Hill Psychologist; and William Harris, SCI-Camp Hill's Food Service Manager.  (Id.)

by the parties,  is Defendants' Second Motion for Summary Judgment (Dkt. Entry 92) asserting that Brown's SMU conditions satisfied the Eighth Amendment requirement of "minimal civilized measure of life's necessities" in accordance with Farmer v. Brennan, 511 U.S. 825, 834 (1994)(citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  Having carefully reviewed the parties' submissions and the contentions proffered during oral argument heard on July 27, 2007, I have concluded that summary judgment should be granted in favor of defendants on both remaining Eighth Amendment claims.[2]

## II.    Statement of Facts.

### A.    Nutritionally Inadequate Diet Claims.

Daily meals for Pennsylvania Department of Corrections ("DOC") inmates are planned and prepared to meet minimum dietary standards.  The DOC has a Spring/Summer

---

[2]  As a procedural matter, defendants originally submitted the unsigned declarations of Deputy John Palakovich and Food Service Manager Harris in support of their motion.  (See Dkt. Entries 93-7 and 93-6.)  Brown filed his opposition materials without issue or objection to the unsigned declarations.  (See Dkt. Entries 94-97.)  The same day Brown filed his opposition materials, defendants submitted signed copies of Palakovich and Harris' declarations.  (See Dkt. Entry 98.)  The Court accepted the executed declarations, noting that Brown would not be prejudiced by the substitution of executed declarations for unsigned declarations as the signed declarations were identical to those previously submitted, except for the fact that they were signed.  (See Dkt. Entry 99.)  At oral argument Brown stated he never received signed copies of the Palakovich or Harris declarations, and on that basis asked that they be stricken from the record.  Defense counsel represented that she personally placed copies of the executed declarations in the mail addressed to Brown.  As Brown failed to demonstrate any prejudice as a result of his alleged failure to receive signed copies of the declarations, his request to strike the declarations was denied.

and Fall/Winter Master Menu, with four week cyclical menus.  The Master Menu is approved for

nutritional content and caloric value and adheres to the Recommended Dietary Allowances and

Dietary Intakes for males and females as identified by the Food and Nutrition Board of the

National Research Council.  The standard diet, and the alternate protein sources offered in lieu

of meat entrees, are reviewed and approved by a Dietitian registered with the Commission on

Registration of the American Dietetic Association.  (Dkt. Entry 92-3, Defendants' Statement of

Undisputed Facts ("DSF") at ¶¶ 1-9; Dkt. Entry 93-2, Gordon Decl. at ¶¶ 1- 5 and ¶ 10.)

Each Master Menu includes a choice of a meat entree, or an alternate protein

entree, to be served at the dinner and supper meals for inmates who for personal, medical or

religious reasons do not eat meat.  (Dkt. Entry 92-3, DSF at ¶ 6; Dkt. Entry 93-2, Gordon Decl.

at ¶ 5.)   Except for those inmates who require "special" diets,[3] all prisoners in a particular

prison receive meals prepared from the same Master Menu.  (Dkt. Entry 92-3, DSF at ¶ 8; Dkt.

Entry 93-2, Gordon Decl. at ¶ 6.)  Except for those inmates who receive "special" diets, the

portion size of meals served to prisoners in the SMU are the same as those served to prisoners

confined in other housing units within the prison.  (Dkt. Entry 92-3, DSF at ¶ 9; Dkt. Entry 93-2,

Gordon Decl. at ¶ 8.)  The size of a meal that includes the alternate protein source in lieu of the

meat entree is the same for inmates fed throughout the institution, regardless of their housing

---

[3]  Prisoners must obtain the approval of a physician or dentist to be placed on a "special" diet.  (DSF at ¶ 8.)

-4-

assignment.  (Dkt. Entry 92-3, DSF at ¶ 9; Dkt. Entry 93-2, Gordon Decl. at ¶ 9.)

All meals are prepared by staff in the kitchen at SCI-Camp Hill.  (Dkt. Entry 98-3, Palakovich Decl. at ¶ 6.)  Meals provided to inmates in general population are served by prisoners employed in the kitchen under the supervision of DOC employees.  (Id. at ¶ 8.)  SMU inmates receive their meals in their cell.  (See www.cor.state.pa.us, DOC Policies, DC-ADM 610, Food Service Policy.)  Facility Superintendents, Psychologists and Unit Managers have no direct involvement in the creation of the Master Menus or the delivery of the meals.  (Dkt. Entry 92-3, DSF at ¶ 10; Dkt. Entry 93-2, Gordon Decl. at ¶ 3.)

Brown resided in SCI-Camp Hill's SMU between late May 2001 and early February 2002.  (Dkt. Entry 1, Complaint at ¶ 38 and Dkt. Entry 96, Plaintiff's Affidavit at  ¶ 1.)  Prisoners at SCI-Camp Hill who do not eat meat for religious or medical reasons may request an alternate protein source as a substitute for the meat entree.  (Dkt. Entry 98-3, Palakovich Decl. at ¶ 9; Dkt. Entry 97, Dawkins Decl. at ¶ 3.)  The option of requesting an alternate protein source as a substitute for pork was available to Brown while confined in SCI-Camp Hill's SMU.  (Dkt. Entry 98-3, Palakovich Decl.  at ¶ 10; Dkt. Entry 98-4, Harris Decl., Exh. 1.)

In December 2001, Brown filed a grievance charging Defendants Dragovich, Palakovich, Steigerwalt, Benning and Harris with limiting food portions for SMU inmates as a means of punishment and as a behavior modification tool.  (Dkt. Entry 98-4, Harris Decl., Exh. 1.)  Brown claimed that the food portions served SMU inmates did not meet the caloric

-5-

requirements set by law, especially when pork was served.  (Id.)  Brown complained that even

though he ate all meat except pork,[4] he was "forced" to take an "alternative meal" as the "non-

pork trays consist of no protein and less food portion."  (Id.)  Defendant Harris denied food was

used as punishment in the SMU.  He also denied that Brown was being served less food than

inmates in general population.  (Harris Decl. at Exh. 2.)  Brown was advised that inmates

electing a "no pork" tray receive the regular meal, except that the pork is removed and no meat

substitution is provided.  As a result, inmates selecting a "no pork" tray would receive less food

than others who had made a different selection when pork is served.[5]  (Harris Decl. at ¶ 6.)

Harris advised Brown that if he wished to have a protein substitute when pork was served, he

would have to request an alternative protein tray and his request would be honored.  (Id. at ¶

7.)

Brown acknowledges the availability of pork trays, alternative trays, and non-pork

trays to SMU inmates.  (Dkt. Entry 96, Appeal to Superintendent of Grievance No. 9412, pp. 12

- 13.)  Brown admits to electing the "non pork tray over the alternative [tray] because [he] eat[s]

meat."  (Id. at p. 13.)  He is aware that inmates electing non-pork trays receive less food than

---

[4]  At oral argument, Brown contradicted this statement by reporting, for the first time,
that he did not consume any red meat or pork.  I will not consider Brown's recent dietary
preferences when resolving this issue as the remainder of the summary judgment record is
clear that Brown repeatedly advised SCI-Camp Hill prison officials that he ate all meat other
than pork.

[5]  At oral argument, Brown stated that pork was served once a week.

those selecting the alternative protein source tray.  (Id.)

Brown was not treated any differently than general population inmates when he selected a no-pork tray, but did not select an alternate protein source at the same time.  (Dkt. Entry 98-4, Harris Decl. at ¶ 8.)  Palakovich never received a complaint from Brown that he had requested, and been denied, an alternate protein as a substitute when pork was served as the meat entree.  (Dkt. Entry 98-3, Palakovich Decl. at ¶ 11.)  Superintendent Dragovich and Deputy Palakovich had no knowledge that Brown was experiencing hunger pains, migraines or other physical problems as a result of his confinement in the SMU.   (Dkt. Entry 93-3, Dragovich Decl. at ¶ 13; Dkt. Entry 98-3, Palakovich Decl. at ¶ 13.)  Harris, Palakovich, Steigerwalt and Dragovich deny any knowledge of, or involvement in, any psychological experiments being conducted on SMU inmates that involved the deprivation of food  (Dkt. Entry 98-4, Harris Decl. at ¶ 9; Dkt. Entry 98-3, Palakovich Decl. at ¶ 9; Dkt. Entry 93-4, Steigerwalt Decl. at ¶ 16; Dkt. Entry 93-3, Dragovich Decl. at ¶.)  Defendants Palakovich, Steigerwalt and Dragovich had no involvement in the preparation or delivery of meals to inmates at SCI-Camp Hill.  (Dkt. Entry 98-3, Palakovich Decl. at 5 and 7; Dkt. Entry 93-4, Steigerwalt Decl. at ¶¶ 14 - 15; Dkt. Entry 93-3, Dragovich Decl. at ¶¶ 7 - 8.)

Brown offers the declaration of Inmate Dawkins, who claims he met Brown while

confined in the SMU in March 2001.[6]   (Dkt. Entry 97, Counter Declaration of Al Dawkins.)

Dawkins states that even within the SMU, food portions are inconsistent.  (Id. at ¶ 3.)  He

further states that SMU inmates cannot select an alternate meal when pork is served.  Rather,

when pork is served, "the inmate would have to eat the meal that was served with the pork,

excluding the pork."   (Id. at ¶ 9.)  Yet, according to Dawkins, "there are alternate trays[,] but an

inmate must wait thirty days to get an alternate tray."  (Id. at ¶ 3.)  Dawkins swears he

personally heard Brown complain to Superintendent Dragovich that he was suffering from

various physical maladies as a result of receiving inadequate portions of food.  Dawkins

personally heard Superintendent Dragovich tell Brown to sign up for sick call.  (Id. at ¶ 6.)

Dawkins states Brown signed up for sick call and shared his concerns with a Physician

Assistant.  (Id.)[7]

**B.   SMU Conditions of Confinement - Excessive Light/Sleep Deprivation.**

SCI-Camp Hill's SMU is a level 5 security unit which houses "inmates who are

disruptive and violent."  (Dkt. Entry 95, SMU Handbook, revised 07/01/2005, p. 7.)  At night,

---

[6]  Dawkins asserts that he met Brown "who was transferred to the SMU on or about March 2001."  (Id. at ¶ 2.)  Brown, however, states he was transferred to SCI-Camp Hill's SMU on May 23, 2001.  (Dkt. Entry 1 at ¶ 23.)

[7]  Significantly, Brown has produced no objective evidence of weight loss or symptoms that may be attributed to an inadequate diet. On the contrary, he notes that when he raised the issue with Unit Psychologist Marsh, Marsh noted that Brown suffered no weight loss and did not demonstrate any symptoms of being deprived of food.  (Dkt. Entry 96, Plaintiff's Affidavit at ¶ 5.)

SMU cells are lit by a fifteen (15) watt security light, which provides illumination to allow

corrections officers to conduct security check on prisoners.  (Dkt. Entry 93-4, Steigerwalt Decl.

at ¶¶ 8 and 10.)  This wattage is consistent with American Correctional Association ("ACA")

standards and is insufficient for prisoners to read by without straining.  (Id. at ¶¶ 9 - 10.)

       In November 2001, SCI-Camp Hill's SMU underwent a renovation.  (Dkt. Entry

96, Plaintiff's Affidavit at ¶ 6.)  Prior to the renovations, there were low wattage security lights in

each SMU cell and the cell walls were painted in a water based beige paint.  (Dkt. Entry 95,

Plaintiff's Statement of Undisputed and Disputed Facts ("PSUDF") at ¶ 7.)  Brown claims that

after the renovation, the security light in Brown's SMU cell was repositioned to be directly over

his head and his cell walls were repainted with a high gloss beige finish.  (Id. at ¶ 8.)  On

December 12, 2001, Brown filed grievance no. 9626, requesting a lower wattage bulb be

placed in the SMU security light in his cell because it shone  directly on his face.  He also

claimed the brightness of the security light was enhanced by the new beige paint.  Brown

argued that the light interrupted his normal sleeping patterns, causing him to suffer physical and

psychological problems.  (Dkt. Entry 96, Plaintiff's Affidavit, Grievance No. 9626 at p. 16.)

Steigerwalt responded that the night light already contained a low watt bulb and would not be

changed.  (Id. at p. 17.)

       Brown appealed to Superintendent Dragovich, who denied Brown's appeal,

noting that "[t]he nightlights are a security feature in restricted housing and are necessary to

ensure security and inmate safety," and that "the beige paint which was recently applied is the same color that was previously in the cells and was not changed." (Id. at p. 20.)   Each of the defendants denies any involvement in selecting the color of the paint to be used on the walls within the SMU.  (Dkt. Entry 93-3, Dragovich Decl. at ¶ 10; Dkt. Entry 93-4, Steigerwalt Decl. at ¶ 11; Dkt. Entry 93-5, Marsh Decl. at ¶ 16; Dkt. Entry 98-3, Palakovich Decl. at ¶ 10.)  Likewise, Steigerwalt, Dragovich and Palakovich disavow knowledge of, or involvement in, any psychological or other sleep deprivation experiments conducted on SMU inmates.  (Dkt. Entry 93-4, Steigerwalt Decl. at 16; Dkt. Entry 93-3, Dragovich Decl. at ¶ 9; Dkt. Entry 98-3, Palakovich Decl. at ¶ 9.)  Both Dragovich and Palakovich disclaim knowledge that Brown was suffering physical or psychological problems as a result of his confinement in the SMU.  (Dkt. Entry 93-3, Dragovich Decl. at ¶ 13; Dkt. Entry 98-3, Palakovich Decl. at ¶ 13.)  Although Brown complained to Psychological Services Specialist Marsh about the ill effects of the night light and paint inside his cell, Marsh saw no evidence that Brown suffered harm as a result of them.  (Dkt. Entry 93-5, Marsh Decl. at ¶ 7.)

## III.    Standard of Review.

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the

nonmoving party's case.  Celotex Corp., 477 U.S. at 325.  Once the moving party has shown

the lack of evidence supporting an essential element of the non-moving party's claim, the

burden then shifts to the non-moving party, who "must do more than simply show that there is

some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  Moreover, he may not simply "replace conclusory allegations

of the complaint or answer with conclusory allegations of an affidavit."  Lujan v. National Wildlife

Fed'n, 497 U.S. 871, 888 (1990)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986)).  Rather, he must "set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e). Unsubstantiated arguments made in briefs are not considered evidence

of asserted facts.  Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

At the summary judgment stage, the court's function is not to weigh the evidence

and determine the truth of the matter, but rather to determine whether there is a genuine issue

for trial.  Anderson, 477 U.S. at 249.  In reviewing the evidence, facts and inferences must be

viewed in the light most favorable to the nonmoving party.  Matsushita, 475 U.S. at  587.  The

mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment.  Anderson, 477 U.S. at 247-248.  Summary

judgment must be entered in favor of the moving party "[w]here the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party."  Matsushita, 475 U.S. at

587 (citations omitted).

## IV.    Discussion.

The Eighth Amendment prohibition against cruel and unusual punishment demands that prison officials not house inmates under conditions that deprive them of one or more basic human needs, such as the basic human need for reasonable safety, adequate physical space, and the need for some degree of ventilation and fresh air.  Helling v. McKinney, 509 U.S. 25, 32 (1993).  However, the Eighth Amendment does not mandate that prisons be free of discomfort.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  "No static test determines whether conditions of confinement are cruel and unusual.  These terms must 'draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society.'" Tillery v. Owens, 719 F. Supp. 1256, 1262 (W.D. Pa. 1989)(citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).  Conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.  Rhodes, 452 U.S. at 348.

To establish an Eighth Amendment claim, Brown must show that the conditions of his confinement pose "a substantial risk of serious harm" to his health or safety.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  In reviewing this type of claim, the courts have stressed the duration of the complainant's exposure to the alleged unconstitutional conditions and the "totality of the circumstances" as critical to a finding of cruel and inhumane treatment. Moreover, the focus must be on the deprivation of a particular basic necessity. As explained in Wilson v. Seiter, 501 U.S. 294, 304-05 (1991):

> some conditions of confinement may establish an Eighth
> Amendment violation 'in combination' when each would not do so
> alone, but only when they have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise - - for example, a low cell temperature
> at night combined with a failure to issue blankets.  To say that
> some prison conditions may interact in this fashion is a far cry from
> saying that all prison conditions are a seamless web for Eighth
> Amendment purposes.  Nothing so amorphous as 'overall
> conditions' can rise to the level of cruel and unusual punishment
> when no specific deprivation of a single human need exists.

In addition to showing conditions that pose a significant risk of serious harm, the

inmate  must show that the person or persons responsible for the conditions of confinement

acted with "a sufficiently culpable state of mind."  Wilson, 501 U.S. at 298.  As described by the

Supreme Court in Farmer, the standard for determining deliberate indifference in a conditions of

confinement case is whether a prison official knew of and disregarded an excessive risk to an

inmates's health or safety.  Farmer, 511 U.S. at 837.   The Court added that "it is enough that

the official acted or failed to act despite his knowledge of a substantial risk of harm."  Id. at 842.

It is well established at common law that a plaintiff can only recover damages for

actual injury suffered as a result of the alleged tort.  See Memphis Community School Dist. v.

Stachura, 477 U.S. 299, 307 (1986).   The Supreme Court has held that 42 U.S.C. § 1983

"creates 'a species of tort liability in favor of persons who are deprived of rights, privileges, or

immunities secured to them by the Constitution.'"  Id. at 305-06 (quoting Carey v. Piphus, 435

U.S. 247, 253 (1978)(internal quotation and citation omitted).  As such, claim for damages

-13-

under Section 1983 should be determined "according to principles derived from the common

law of torts." Id.  Compensatory damages cannot be awarded for violation of a constitutional

right absent proof of actual injury.  Id. at 308; see also Padilla v. Miller, 143 F. Supp.2d 453,

475 (M.D. Pa. 1999)(citing  Bolden v. Southeastern Pennsylvania Transportation Authority, 21

F.3d 29, 34 (3d Cir. 1994)("There is no right to damages other than nominal ones for a violation

of a Constitutional right unless actual injury is proven.")  Yet, the Supreme Court clearly holds

that mental and emotional distress can constitute compensable injury in Section 1983 cases.

Carey, 435 U.S. at 264.  "While there need not be expert testimony of the existence of

emotional distress or mental anguish and a causal relationship between such distress or

anguish and the constitutional violation, emotional distress is not to be presumed from a mere

violation of a constitutional right.  There must be individualized proof of the fact of injury, its

extent and its cause."  Padilla, 143 F.Supp.2d at 475 (internal citations omitted).  As this case is

filed by an inmate, additional consideration must be given to Section 803(d) of the Prisoner

Litigation Reform Act, codified at 42 U.S.C. §1997e(e), which predicates a prisoner's claim for

mental or emotional injury, suffered while in custody, on a showing of accompanying physical

injury.  Under § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a

jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody

without a prior showing of physical injury."  The "physical injury" requirement of § 1997e(e) may

be satisfied by a  "less-than-significant-but-more-than-de minimis physical injury as a predicate

to allegations of emotional injury."  Mitchell v. Horn, 318 F.3d 523, 534 (3d Cir. 2003).  The

absence of "physical injury," however, does not mean plaintiff cannot establish an Eighth

Amendment violation.  See, e.g., Hudson v. McMillian, 503 U.S. 1, 9-10 (1992); see also Smith

v. Mensinger, 293 F.3d 641 (3d Cir.2002).  By its plain terms, § 1997e(e) bars relief for "mental

or emotional injury," but does not otherwise limit the relief available to prisoners for Eighth

Amendment violations.  Thus, in order to establish his claim for compensatory damages under

Section 1983, plaintiff must establish that defendants' actions were a proximate cause of

plaintiff's alleged, and identifiable, physical injuries.[8]

> ### A.    Claim of Inadequate Nutrition.

Prisoners are entitled to a nutritionally adequate diet.  Ramos v. Lamm, 639 F.2d

559, 571 (10th Cir. 1980).  The Eighth Amendment requires that prison officials serve

"nutritionally adequate food that is prepared and served under conditions which do not present

an immediate danger to the health and well being of the inmates who consume it."  Id., 639

F.2d at 571.  "A substantial  deprivation of food may be sufficiently serious to state a conditions

_____

[8]  The rule for awarding punitive damages is unaffected by the actual injury requirement.
The purpose of punitive damages is "to punish the defendant for his willful or malicious conduct
and to deter others from similar behavior."  Memphis, 477 U.S. at 307 n.9.  However, punitive
damages are available in Section 1983 cases only after defendant's threshold liability is
established and "the defendant's conduct is shown to be motivated by evil motive or intent, or
when it involves reckless or callous indifference to the federally protected rights of others."
Smith v. Wade, 461 U.S. 30, 56 (1983).  Without an initial finding of defendant wrongdoing,
there can be no award of punitive damages.

of confinement claim under the Eighth Amendment."  Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002).

The undisputed facts show that the meals provided to inmates at SCI-Camp Hill, including those confined the SMU, are prepared according to Master Menus.  Each meal, which includes a protein alternative, is certified by a Dietitian to meet the current Recommended Dietary Allowances and Dietary Reference Intakes for males and females identified by the Food and Nutrition Board of the National Research Council.

The parties do not dispute that Brown, while confined in the SMU, had the ability to elect one of three types of meal trays to be served to him: (1) the regular fare; (2) a "non-pork" tray, which consisted of the regular fare minus the pork entree on those occasions pork is served; and (3) an alternative protein tray, which provides an alternative form of protein in place of the meat entree offered in the regular fare.  Brown admits to electing the "non pork tray".  (Dkt. Entry 96, Plaintiff's Affidavit, p. 13.)  Based on Brown's own submissions and testimony, he was aware of his tray options and willingly agreed to accept less food than other SMU inmates who either elected to receive the regular fare or alternative protein tray on those days when pork was served, which according to Brown,  was once a week.  Thus, to the extent Brown argues that Defendants are punishing him because he did not eat pork, his claim must fail.

As for his claim that his SMU food portions on any given day were manipulated

by defendants, or with defendants' knowledge, for the purpose of psychological experiments,

Brown has failed to present any supporting evidence.  The mere fact that Brown was weighed

every thirty days is not a sufficient showing that the Master Menu nutritionally certified meals

and/or their appropriate serving portions were being altered when served to him, let alone

tampered with for any nefarious reasons.  Furthermore, Brown has not presented any evidence

of weight loss while in the SMU, even though he claims to have been weighed every thirty

days.[9]  The fact that Brown was routinely weighed also serves to belie his assertion of

deliberate indifference as it shows that there was a conscious attempt to guard against weight

loss.

        In any event, it is undisputed that none of the defendants were  involved in

preparing or serving meals to Brown.  None of the defendants were aware that he suffered any

physical or psychological problems because of a lack of nutrition.  Although Brown states he

---

[9]  At oral argument Brown stated that he did not have the opportunity to conduct discovery to support his claim that he suffered weight loss or ill effects from lack of nutrition. Brown, however, admitted that he did conduct discovery in this case, but that it focused on other issues.  At no time prior to the July 27, 2007, oral argument did Brown ever claim that he was unable, or prevented, from conducting discovery related to his SMU conditions of confinement claims.  I do not find that Brown was prevented, in any manner, by defendants or this Court, from conducting discovery in this case.  There is no indication that Brown's failure to obtain discovery supportive of his allegations of weight loss or physical and emotional injuries within the time prescribed was due to bad faith or neglect on defendants' part.  Thus, Brown's eleventh hour claim of the same does not present "good cause" for re-opening or extending the discovery period in this case, which ended in April 2005.  (See Dkt. Entry 18, Order of February 24, 2005.)

suffered hunger pangs and other physical maladies as a result of this alleged lack of food, he does not provide any evidence that he suffered any medical or mental health complications during his SMU stay at all, let alone an ailment attributable to an allegedly inadequate diet. Brown does not assert that he was denied adequate medical care for any ailment attributed to his lack of sustenance.  Brown does not provide excerpts of his SMU or medical records that would support a finding that he suffered any weight loss, or had an unhealthy body weight, as a result of malnourishment during his SMU stay.

Brown's choice to forgo the different meal opportunities available to him does not render his conditions of confinement, specifically his diet, constitutionally inadequate.  Brown's Eighth Amendment claim that he was purposefully given a nutritionally inadequate diet is speculative at best.  It is not enough for a prisoner to allege that his food portions were inadequate.  There must be more in the way of evidence of deleterious impact of a prolonged deficient diet.  No substantiation of Brown's claim has been presented.  Given these circumstances, defendants are entitled to judgment in their favor on this claim without the necessity of a trial.

**B.    Excessive Light/Sleep Deprivation Claim.**

Requiring inmates to live in constant illumination, under certain circumstances, may rise to the level of an Eighth Amendment violation.  See Bacon v. Minner, 2007 WL 1157138 (3d Cir. April 19, 2007)(citing Keenan v. Hall, 83 F.3d 1083, 1090-91 (9 Cir.

1996)(constant illumination so that inmate cannot discern day from night and which causes

"grave sleeping problems" and other mental and psychological problems unconstitutional).

However, continuous exposure to low wattage night time security lighting may be permissible

based on legitimate penological interests, such as prison security concerns.  Turner v. Safley,

482 U.S. 78, 89 (1987); see also Chavarria v. Stacks, 102 Fed. Appx. 433, 436-37 (5th Cir.

2004)("policy of constant illumination [was] reasonably related to the legitimate penological

interest of guard security"); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987)(continuous

lighting in holding cell not unreasonable given security concern); King v. Frank, 371 F. Supp. 2d

977, 984-85 (W.D. Wisc. 2005)(constant exposure to a 9 watt fluorescent light which allows

prison officials to observe inmates at night did not violate Eighth Amendment standards); Willis

v. Terhune, 404 F. Supp.2d 1226, 1230-31 (E.D. Cal. 2005)(exposure to 24 hour 13 watt

security bulb did not constitute cruel and unusual punishment in absence of evidence of "grave

sleeping problems" or other harm).

            Brown alleges that the 15 watt security night light prevented him from adequately

sleeping, and that this caused a variety of sleep-related psychological problems.  Defendants

all affirm that they were not aware that Brown's SMU living conditions were harmful to his

health.  Defendant Marsh, a Psychological Services Specialist, states that, although Brown

complained of psychological problems due to lack of sleep, he saw no evidence of the same.

Brown offers no evidence to the contrary.  Furthermore, defendants argue that the security light

-19-

Brown complained of does not constitute cruel and unusual punishment in violation of the

Eighth Amendment as it provided only minimal illumination.  Unlike <u>Keenan</u>, <u>supra</u>, Plaintiff

offers no evidence that he suffered from "grave sleeping conditions" or any medical or

psychological problems due to the SMU security light policy.[10]  As in the case of the alleged

inadequate food, Brown has not presented any evidence that he sought medical attention for

symptoms purportedly attributable to the lighting conditions in his cell.  Thus, the Court finds

Plaintiff has failed to establish a likelihood of success on the merits of this claim.  Defendants

are entitled to summary judgment.

_____

[10]  Brown reliance on <u>Harris v. Horn</u>, 747 A.2d 1251 (Pa. Cmwlth. 2002), in his
opposition materials and at oral argument as precedent for the survival of his claim past
summary judgment is misplaced.  Although <u>Harris</u> concerns a claim of a SCI-Camp Hill SMU
inmate that the constant illumination of the SMU security light caused him physical and
psychological harm, <u>Harris</u> was decided in the procedural context of the state law equivalent of
a motion to dismiss, which tests only the legal sufficiency of the claims presented.  In the
present case, we have long passed the motion to dismiss phase, where allegations of physical
and psychological harm are enough to permit an Eighth Amendment claim to proceed to the
discovery phase.  The purpose of summary judgment is "to pierce the pleadings and assess the
proof in order to see whether there is a genuine need for trial."  <u>Matsushita</u>, 475 U.S. at 587.  At
this stage, Brown may not rest on the bare allegations contained in his pleadings, but is
required by Fed. R. Civ. P. 56(e) to go beyond the pleadings by way of affidavits, depositions,
answers to interrogatories or the like in order to demonstrate specific material facts which give
rise to a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 324.

## V.      Conclusion.

For the foregoing reasons, Defendants' Second Motion for Summary Judgment will be granted.  An appropriate order will issue.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID BROWN** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL NO. 3:CV-03-2392** |
| **v.** | : | |
| | : | **(JUDGE VANASKIE)** |
| **BENJAMIN A. MARTINEZ, <u>ET</u> <u>AL.</u>,** | : | |
| | : | |
| **Defendants.** | : | |

# O R D E R

**NOW**, this **31st** day of **July, 2007,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Defendants' Second Motion for Summary Judgment
    (Dkt. Entry 92) is **GRANTED**.

2.  The Clerk of Court is directed to enter judgment in
    favor of all remaining Defendants and to mark this
    matter **CLOSED.**

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge
